# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SUN WILLIAMS,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.:** |
| | ] | **5:06-CV-2006-VEH** |
| **HARVEY BENJAMIN FORDHAM,** | ] | |
| **III, et al.,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## <u>MEMORANDUM OPINION</u>

Before the court is the motion of the Defendants, K & K Food Services and

Harvey Benjamin Fordham, III ("Defendants"), for summary judgment on the claims

of the Plaintiff, Sun Williams ("Plaintiff"), filed on January 31, 2008.  (doc. 30).

Also before the court are two motions to strike portions of Plaintiff's evidentiary

submission, filed by Defendants on January 31, 2008 (doc. 37) and March 3, 2008

(doc. 41).

For the reasons explained, the motion for summary judgment is due to be

**GRANTED**.  The motions to strike are due to be **DENIED as MOOT**.

## I.      FACTUAL HISTORY[1]

K & K Food Services ("K & K") has operated a dining facility at Redstone Arsenal near Huntsville, Alabama since 1997.  (AF # 2).[2]  In compliance with a government contract, K & K serves meals to military personnel at the Redstone Arsenal.  (*Id.*).  K & K is a joint venture between Harvey Benjamin Fordham, III ("Fordham") and KCA Corporation, of which Fordham owns a 51% interest.  (AF # 1).  At the time of this action, Fordham served as the majority owner of K & K, Dan Tyree ("Tyree") was project manager, and Dennis Hardin ("Hardin") was assistant manager.  (AF # 5).

K & K employs various personnel at the Redstone Arsenal, including cooks,

---

[1]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as "facts" in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Facts are undisputed unless otherwise noted.  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

[2]  The designation "AF" stands for "admitted fact" and indicates a fact offered by Defendants that Plaintiff has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.  Whenever Plaintiff has adequately disputed a fact offered by Defendants, the court has accepted Plaintiff's version. The court's numbering of admitted facts (*e.g.*, AF # 1) corresponds to the numbering of Defendants' Statement of Facts as set forth in doc. 31 and responded to by Plaintiff in doc. 39.  Similarly, the designation "AAF" stands for "additional admitted fact" and corresponds to Plaintiff's Statement of Facts contained in doc. 39 and responded to by Defendants in doc. 40.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

mess attendants, and "head counts," who count military personnel before they enter the dining hall.  (AF # 6).

Plaintiff entered employment at the Redstone Arsenal dining facility in 1994, and continued her employment there after K & K assumed operations in 1997.  (AF # 20).  She was employed as a mess attendant leader, and was responsible for overseeing the cleaning of the dining facility.  (AF # 22).  She reported to Cook I's Doris Howard and Forrest Kinney.  (AF # 23).

Prior to this action, Plaintiff was a guardian to her niece, Sunna Reed ("Reed").  (AF # 26).  During all times relevant to this action, Reed was no longer a minor and no longer under Plaintiff's guardianship.  (Pl. Dep. pg. 25).

At some point during Plaintiff's employment at K & K, but prior to March 2001, Reed visited Plaintiff at the dining facility where she met Dennis Hardin, who was then working as a cook.  (AF # 38; Hardin Aff. ¶ 11).  Reed does not appear to have been in contact with Hardin again until she became employed by K & K in March 2001.  (*Id.*).

From March 2001 until December 2002, Reed worked for K & K as a mess attendant.  (Hardin Aff. ¶ 9; Reed Dep. pp. 164, 172, exh. 4).  During this tenure at K & K, Reed worked the morning shift and Hardin worked the evening shift, and they saw each other only briefly during the shift changeover.  (Reed Dep. pp. 173-74).

During this time, Reed learned from a coworker that two former K & K employees had complained about "inappropriate sexual behavior" by Hardin, but she did not witness any of this behavior herself. (Reed Dep. pp. 177-80). She did not experience any difficulty with Hardin, and described her interactions with him as "pleasant and professional." (*Id.* pg. 174).

In late 2002, Reed got married, left her employment with K & K and moved to another state. (*Id.* pg. 174-76). In July 2004, she returned and sought reemployment from Defendants.[3] (*Id.*). Hardin had since been promoted to assistant manager of the dining facility. (Hardin Aff. ¶ 8). During Reed's second tenure at K & K, she worked under the supervision of Mess Attendant Leaders Clarence Davis and Sue Dobbs as a part-time cashier and later as a head count. (*Id.* ¶¶ 15-18). Reed did not work under Hardin's direct supervision. (*Id.* ¶ 18).

After Reed's return to K & K, Plaintiff began to notice that Hardin was sexually harassing Reed. (AF ## 41, 45-46, 48). Specifically, Plaintiff observed Hardin standing close to Reed several times while Reed was working, and touching Reed several times while Reed was signing in to work. (Pl. Dep. pp. 125-128). On one occasion, Hardin told Plaintiff he would be her new son-in-law. (AF # 41). He

---

[3] Reed listed Hardin as a reference on both of her applications for employment with K & K (first in 2001 and again in 2004). (Reed Dep. pp. 163, 183).

4

also called Plaintiff's house and her cell phone four or five times late at night looking for Reed.  (Pl. Dep. pp. 129-131).  On another occasion, Plaintiff observed Reed crying, and Reed told her that Hardin "had yelled at her about soldiers."[4]  (AF # 45).

Plaintiff informed Dan Tyree that Reed was having a "problem" with Hardin, but did not tell Tyree the nature of the problem.  (Pl. Dep. pg. 162).  She told Tyree that he needed to speak with Reed about it, and Tyree assured her that he would.[5] (*Id.*).

At some point thereafter, Tyree approached Reed while she was working in the dining hall to speak with her about Hardin.  (Reed Dep. pp. 255-257).  Reed could not discuss the matter at that time as she was in the middle of a head count.  (*Id.*).  Neither Reed nor Tyree attempted to discuss Hardin again.  (*Id.*).

Plaintiff continued working for K & K throughout Reed's first and second tenures at the Redstone Arsenal dining facility.  She did not experience any harassment from Hardin.

She did, however, encounter problems with a coworker named Ferletia Sheppard ("Sheppard") in March 2005.  (Pl. Dep. exh. 12).  In her EEOC charge,

_____

[4]  The actual content of this argument is unclear from the record.

[5]  Reed herself apparently did not "officially" report Hardin's behavior to Defendants. (Reed Dep. pg. 262).  She filed a union grievance against Hardin, and believed the union was "involved" with her complaint.  (*Id.* pg. 251, 309-10).  Any involvement the union may have had with Reed's complaint appears to have dissolved upon her termination in April 2005.

Plaintiff described her difficulty with Sheppard as follows:

> Even though I feared retaliation [from K & K], on March 13, 2005 I
> made a written complaint to management about another sexually
> harassing situation in the workplace.  A female employee, Felicia [sic]
> Sheppard, was harassing me because a male customer asked me to give
> his number to a "light skinned black female" (possibly referring to Ms.
> Sheppard).  I did not give the customer's phone number to her because
> as a Mess Attendant Leader, a supervisory position, it is not my job to
> help other employees to date and/or have romantic and/or sexual
> relationships at the workplace.  Sheppard was very angry at me because
> I did not facilitate her relationship with the male customer, and
> proceeded to cuss at me and threaten me with bodily harm, even waiting
> for me in the parking lot to continue making threats.  I called security,
> and turned in my written complaint to the company out of fear for my
> safety.  Sheppard's harassment of me continued, and I submitted another
> letter to management on March 14, 2005.  I believe that Sheppard had
> a sexual relationship with Hardin, and he protected her in this situation.
> To my knowledge, no investigation was conducted by the company
> regarding my complaints.  However, the government conducted an
> investigation because Redstone Arsenal security had been called.
>
> At a company meeting, project manager Dan Tyree and assistant
> manager Dennis Hardin had instructed all K and K employees not to talk
> to anybody from the government.  We were told that those who did
> speak with government employees would be terminated.  In March
> 2005, I cooperated with government investigator Fred B. Keith
> regarding his investigation into the incident involving Felicia Sheppard.

(Pl. Dep. exh. 11).

On or about April 10, 2005, Reed was locked out of Redstone Arsenal on her

way to work, causing her to arrive late to her scheduled shift.  (*Id.*).  She called

Plaintiff, who was working in the dining facility, and informed Plaintiff that she

would be late.  (*Id.*).  The events that follow are not entirely clear from the record; however, Plaintiff was later accused by Defendants of falsifying Reed's time records to indicate that Reed had arrived at work on time when, in fact, she was several minutes late. (*Id.*; Pl. Dep. exh. 18).  On April 13, 2005, both Plaintiff and Reed were terminated, allegedly for falsifying Reed's time records.[6]  (Hardin Aff. ¶ 16; Reed Dep. exh. 16).

## II.   PROCEDURAL HISTORY

Plaintiff filed her EEOC charge of discrimination against K & K on August 31, 2005.  (Pl. Dep. exh. 11).  In it, she alleged that she was subjected to gender discrimination during her employment and retaliatory discharge. (*Id.*).  She did not include Fordham as a party to her charge. (*Id.*).  On July 6, 2006, the EEOC sent Plaintiff a Dismissal and Notice of Rights, informing Plaintiff that it was unable to conclude that the events alleged in her charge established a violation of Title VII. (Pl. Dep. exh. 21).

Plaintiff filed her Complaint in this action on October 4, 2006, asserting claims of hostile work environment, retaliatory discharge, and negligence and wantonness against KCA Corporation, owner of a 49% interest in K & K.  (doc. 1).  On January

---

[6] According to K & K policy, falsifying an employee's time records is a terminable offense.  (Pl. Dep. exh. 5 ¶ 23).

17, 2007, Plaintiff amended her Complaint to add Defendants this action.  (doc. 2).

On May 21, 2007, this court dismissed Plaintiff's claims against KCA Corporation

for lack of subject matter jurisdiction (*see*, Order, doc. 21).

On January 31, 2008, Defendants filed the pending motion for summary

judgment as to all of Plaintiff's claims against them.  (doc. 30).  Defendants have

since filed two motions to strike portions of Plaintiff's evidentiary material filed in

opposition to the motion for summary judgment.[7]  (docs. 37, 41).  The motion for

summary judgment has been fully briefed and is now subject to the court's review.

## III.   STANDARD OF REVIEW

Summary judgment is proper only when there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P.

56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved

in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th

Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden

of proving that the adverse employment decision was based on intentional

---

[7] Plaintiff has not responded to either motion to strike.

discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148,  156 L.Ed.2d 84 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating

factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05, 93 S.Ct. at 1824-27; *Burdine*, 450 U.S. at 252-54, 101 S.Ct. at 1093-95; *Desert Palace*, 539 U.S. at 101-02, 123 S.Ct. at 2155-56.

## IV.   ANALYSIS

### A.   Hostile Work Environment

A claim of hostile work environment is established under Title VII upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

To establish a prima facie case of hostile work environment on the basis of her gender, Plaintiff must show that: (1) she is a member of a protected class; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) a basis for holding Defendants liable for the environment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Plaintiff asserts two bases for her hostile work environment claim: (1) that

10

Dennis Hardin sexually harassed her niece, Sunna Reed, and (2) Plaintiff was threatened by Ferletia Sheppard.

### 1.     Threats by Ferletia Sheppard

Defendants do not dispute that Plaintiff, an Asian-American female, is a member of a protected class based on her gender, or that she felt subjected to unwelcome harassment due to Ferletia Sheppard's conduct.

Defendants argue that Plaintiff's hostile environment claim as to Sheppard's threats must fail because she cannot establish that Sheppard's conduct was based on Plaintiff's gender.  The court agrees.

Although the court has generally described Sheppard's conduct above, the following facts are also relevant to Plaintiff's hostile work environment claim:  On Sunday, March 13, 2005, after Plaintiff refused to give Sheppard the telephone number as explained *supra*, Sheppard became extremely hostile toward her, yelling at Plaintiff "[F] you bitch," "I'll whoop your ass," and threatening to "knock [Plaintiff's] head off."  (Pl. Dep. pp. 165-67).  Sheppard then waited in the parking lot for almost an hour for Plaintiff to leave the dining facility.  (*Id.*).  When Plaintiff finally entered the parking lot, Sheppard yelled "I'll beat your [F]ing ass" at Plaintiff through her car windows.  (*Id.* pp. 167-68).  When Plaintiff complained to her supervisor, Forrest Kinney, about the incident, Kinney advised her to report it to the

miliary police on base, which she did shortly thereafter.  (*Id.* pg. 168; Pl. Dep. exh. 12).

The following day, Plaintiff alleges that she was again at work with Sheppard and that Sheppard again threatened her with violence by telling her "You need to move or I'm going to burn your ass."  (Pl. Dep. exh. 13).  Sheppard also "walk[ed] by [Plaintiff], bumping into her and laughing, while making comments like, 'There is a lot of crazy people working here,' and 'You crazy bitch.'"  (*Id.*).  Plaintiff amended her complaint to the military police to include these events.  (*Id.*).

After closely examining all of the facts associated with Sheppard's conduct, the court cannot conclude that Sheppard's harassment of Plaintiff was based on Plaintiff's gender.  To support a claim of hostile work environment based on her gender, Plaintiff must establish that the conduct complained of was committed because she is female.  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998).  *See also Mendoza*, 195 F.3d at 1248 n. 5 ("To establish that the harm alleged was 'based on her sex,' [Plaintiff] 'must show that but for the fact of her sex, she would not have been the object of harassment.'  *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)").  Additionally, the Eleventh Circuit has held that the use of profane language, by itself, does not constitute sexual harassment.  *See Baldwin v. Blue Cross/Blue Shield of*

*Alabama*, 480 F.3d 1287, 1301 (11th Cir. 2007) ("the problem for Baldwin's [hostile work environment] case is that very little of [the use of profane language] was aimed specifically at females. Most of the curse words that were frequently used -'fuck,' 'fucking,' 'bullshit,' 'cocksucker,' and 'peckerwood' - are relatively gender-neutral. And it is undisputed (Baldwin herself testified to it) that those curse words were used indiscriminately in front of, and towards, males and females alike. It would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct").

The record is clear that Sheppard has engaged in similarly volatile behavior toward men and women alike. (*Id.*). For example, the military police investigation into Plaintiff's report revealed similar conduct by Sheppard toward a former boyfriend who, apparently, was also employed by K & K. (Pl. Dep. exh. 13). He told police that "Sheppard is very rude and argumentative. Sheppard will cuss at [him], and then report him to management if he retaliates. [K & K] Management knows Sheppard starts drama with many employees, but they just tell her to focus on work and avoid other employees." (*Id.*).

Plaintiff has not produced any evidence that Sheppard targeted her because she is female. She testified that "If I was a man, I don't think anybody want to bother me. Because I am female – they know female weak." (Pl. Dep. pg. 171). Nevertheless,

13

in light of evidence that Sheppard is similarly volatile toward both men and women, the record does not establish that Sheppard harassed Plaintiff <u>because</u> she is female. In short, the court cannot agree with Plaintiff that Sheppard's conduct is "sexual harassment" prohibited by Title VII.   Accordingly, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim as to Ferletia Sheppard's conduct.

### 2.   Harassment of Sunna Reed by Dennis Hardin

Plaintiff also alleges that she suffered a hostile work environment based on Dennis Hardin's harassment of her niece, Sunna Reed.

The following facts are offered to support this claim:  (1) Plaintiff's coworker, Ann Jolly ("Jolly"), told Plaintiff that every woman who works for K & K "got problems," apparently with Dennis Hardin (Pl. Dep. pg. 104); (2) Hardin told Plaintiff around Christmas 2004 that he was going to be her new son-in-law (*Id.* pg. 119); (3) Plaintiff saw Hardin touch Reed several times (*Id.* pg. 125); (4) Plaintiff saw Reed crying at work on an unspecified date, apparently following an argument Reed had with Hardin about "soldiers" (AF # 45); (5) Hardin telephoned Plaintiff's house approximately four or five times "late in the night" looking for Reed[8] (Pl. Dep. pp.

---

[8] On one occasion, Hardin also called Reed's cellular phone and left her a voice message, saying, "If you love me, call me," and asking to see her at night.  (Reed Dep. pg. 248).

129-131); (6) on one occasion, Plaintiff sent Reed to Hardin's house to pick up Avon products Plaintiff had ordered and, upon her arrival, Hardin tried to make Reed sit on his lap (Reed Dep. pp. 266-69); (7) Hardin once told Reed he was hurt that Reed had gotten married and left her first employment with K & K without telling him (*Id.* pp. 221-229); (8) Reed and Plaintiff had been told by other employees about two former coworkers who had been harassed by Hardin and were terminated after they complained to Defendants about it[9] (*Id.* pp. 236-243); (9) Hardin was romantically involved with another K & K employee named Faye Jolly, who "ganged up" on Reed by running over her foot with a dining cart (*Id.* pp. 252-57); (10) when Reed attempted to complain to Hardin about Faye, Hardin slammed his fist on his desk and yelled at Reed to "get the F out" (*Id.* pp. 254-55); (11) Hardin "ma[d]e little advances" toward Reed outside the presence of other employees by touching her legs and brushing against her while she worked, saying to her "you like that, don't you" (*Id.* pp. 261-63, 265); (12) Hardin accused Reed of fraternizing with military personnel in the dining room (*Id.* pg. 270); (13) Hardin told Reed he was "well packed" and that she "couldn't handle him" while Reed cleaned a drink fountain in

---

[9] Reed worked with only one of these former employees, and witnessed one occasion of alleged harassment, when she observed Hardin "rubbing in between [the employee's] legs when she was sitting on [a] desk." (Reed Dep. pp. 237-38). Reed does not appear to have reported this incident.

15

the dining room (*Id.* pp. 274-75); (14) Hardin gave Reed a lace camisole and G-string panty set with an aromatherapy candle for Christmas in 2004 (*Id.* pp. 276-77); and (15) Hardin once told Reed that if she was "good" to him he would assign her as many hours as she wanted (*Id.* pg. 280).

As stated above, there is no dispute that Plaintiff belongs to a protected class based on her gender. However, the facts alleged do not suggest that Plaintiff was subjected to unwelcome harassment by Hardin. Her hostile work environment claim appears to stem, in its entirety, from harassment suffered by Sunna Reed.

Plaintiff may assert a viable hostile work environment claim even if the alleged harassment was not directed at her. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.1995). To do so, Plaintiff must have been aware of the harassment during the time in which she alleges she experienced a hostile work environment. *Hudson v. Norfolk Southern Railway Co.*, 209 F.Supp.2d 1301, 1326 (N.D.Ga.2001). "[P]laintiff 'may also support a claim of hostile work environment by the use of harassing conduct she learned of through hearsay, so long as she was aware of the harassing incidents at the relevant time at which she alleges she experienced the hostile environment.'" *Brantley v. City of Macon*, 390 F.Supp.2d 1314, 1324-25 (M.D.Ga.2005), quoting *Hudson*, 209 F.Supp.2d at 1326, citing, in turn, *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir.1999); *Schwapp v. Town*

16

*of Avon*, 118 F.3d 106, 111 (2nd Cir.1997)).

Considering all the facts described *supra*, Plaintiff's claim must fail because she has not presented sufficient evidence that Hardin's conduct was so severe or pervasive that it altered the terms or conditions of her employment.   Although Plaintiff testified that "we went through horrible when we work at K & K," she also testified that she merely "brushed [Hardin's conduct] off," told Reed to "just ignore him," responded to Hardin's phone calls by telling him to call Reed, and stated that she was "hardly ever around [Hardin]."  (Pl. Dep. pp. 119, 129-31, 155-56).  When she saw Reed crying after her argument with Hardin, she told Reed to speak with Dan Tyree about Hardin, but she also testified that Reed "is over twenty [years old].  She have to handle it on her own." (*Id.* pg. 114).  Finally, while Ann Jolly apparently led Plaintiff to believe that every female employee at K & K has trouble with Dennis Hardin, the record indicates that only three female employees (Sunna Reed, Sin Cha Williams, and "Tammy") have complained about Hardin during his nine-year employment with K & K.  (Reed Dep. pp. 236, 241).

These facts are insufficient to support a hostile work environment claim.  *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 585 (11th Cir. 2000) (no hostile environment where worker placed hand on knee and touched hem of dress, in addition to calling at home repeatedly); *Mendoza*, 195 F.3d at 1247-48 (a

supervisor's: (1) telling the plaintiff he was "getting fired up;" (2) rubbing his hip against the plaintiff's while touching her shoulder and smiling; (3) making sniffing sounds while staring at the plaintiff's groin; and (4) constantly following and staring at the plaintiff, in their totality, "[fell] well short of the level of either severe or pervasive conduct sufficient to alter [the plaintiff's] terms and conditions of employment").

The Eleventh Circuit explained further in *Mendoza* that

> Other circuits have . . . delineate[d] a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII. Many decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this appeal. [ ] *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir.1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); [ ] *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir.1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Black v. Zaring Homes, Inc*., 104 F.3d 822, 823-24 (6th Cir.1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land

area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); [ ] *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir.1993) (holding plaintiff's claims-supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work-were not sufficient for actionable sexual harassment).

*Mendoza*, 195 F.3d at 1246-48.

In contrast, successful hostile work environment claims have involved far more egregious conduct than any alleged in this action. *See, e.g., Stoll v. Runyon*, 165 F.3d 1238, 1239 (9th Cir.1999) ("stalking" is alleged but the court also described the "gruesome facts" as "[n]umerous male coworkers and supervisors asked [plaintiff] to perform oral sex on them, commented on her body, shot rubber bands at her backside, asked her to wear lacy black underwear for them, bumped and rubbed against her from behind, pressed their erect penises into her back while she was sorting mail and unable to get away, followed her into the women's bathroom, asked her to go on vacations, 'stalked her throughout the postal facility,' and fondled her body"); *Harris*

*v. L&L Wings, Inc.*, 132 F.3d 978, 980 (4th Cir.1997) (alleging the main harasser "followed her around the warehouse," but also that he "grabbed [plaintiff], embraced her, stroked her hair, massaged her back and shoulders, fondled her legs," "pinned [plaintiff] against a box and tried to kiss her," persistently "boasts . . . about his sexual prowess, offers to promote her in exchange for dating him, and another offer of a hundred dollars if [plaintiff] would go to bed with him," "offered to reward [plaintiff's] son with a raise if he would convince his mother to go out with him," "[e]very time [plaintiff] encountered [harasser], he would either touch her or make vulgar comments or sexual advances to her or both"); *Hall v. Gus Const. Co.*, 842 F.2d 1010, 1012 (8th Cir.1988) (sexual harassment established with evidence that, *inter alia*, female employees were held down so that other employees could touch various parts of their bodies, including their breasts and legs).

In general, successful hostile work environment claims involve evidence of "extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." *Mendoza*, 195 F.3d at 1247, quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999). None of the conduct alleged in this case rises to the level of "extensive," "longlasting," or "unredressed" threats or conduct that permeated Plaintiff's work environment. The facts alleged do not establish that Plaintiff or Reed was physically threatened or

humiliated by Hardin's conduct, or that his conduct unreasonably interfered with Plaintiff's job performance.  As stated *supra*, Plaintiff admitted that she left Hardin's behavior to Reed to address with Defendants and did virtually nothing to try to resolve it herself, despite the effect she alleges it had on her as well as Reed.  While the conduct may have occurred relatively frequently – all within a ten-month period of time during Reed's second employment with K & K – that alone does not compensate for the lack of evidence that the conduct was severe, physically threatening or humiliating to Plaintiff or to Reed, or that it unreasonably interfered with Plaintiff's job performance.  *See Mendoza*, 195 F.3d at 1248 (holding that the frequency of the alleged conduct does not compensate for the absence of the other hostile work environment factors).  Thus, taken as a whole, the record does not establish that the alleged harassment was objectively severe.

Finally, Plaintiff has not established a basis for holding Defendants liable for Hardin's harassment of Reed.  Plaintiff admitted twice that she never reported the harassment to Defendants because she was afraid it would cause Hardin to lose his job. (Pl. Dep. pp. 159, 170).  Plaintiff appears to also argue that she feared retaliation from Defendants if she complained about Hardin.  However, when asked why she failed to report Hardin to Defendants, she testified only that she feared the consequences of her complaint on Hardin's job, saying nothing about her own

employment.  (*Id.* pp. 159, 170).

Having considered the alleged harassment in its entirety, the court concludes that Plaintiff has not presented sufficient evidence to support her hostile work environment claim.[10]  Accordingly, Defendants are entitled to summary judgment on this claim.

### B.    Retaliation

The Eleventh Circuit has recognized retaliation as a separate violation of Title VII.  *See Gupta*, 212 F.3d at 586.  To establish a prima facie case of retaliation under Title VII, Plaintiff must show that: (1) she participated in a Title VII-protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  *See Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir.2002); *Lucas v. Grainger, Inc.*, 257 F.3d 1249, 1260-61 (11th Cir.2001).

There is no question that Plaintiff suffered an adverse employment action by her termination in April 2005.  However, because Plaintiff admits that she never reported Hardin's harassment of Reed, the court is at a loss as to what "protected

---

[10]  Plaintiff also testified that, at some point prior to Christmas 2004, Hardin accused her of spreading a rumor that he was "screw[ing] with" another K & K employee.  (Pl. Dep. pg. 137). She does not allege that this event supports any of her claims in her Complaint.

activity" Plaintiff claims to have engaged in in relation to Dennis Hardin and his conduct toward Reed. Thus, the court cannot find that this element of her claim is satisfied.

Also, to prove a causal connection between the protected activity and her termination, Plaintiff must demonstrate that Defendants were aware of her protected conduct at the time they made the decision to terminate her. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n. 30 (11th Cir. 2003). Plaintiff offers no evidence to carry her burden on this point. Thus, it is impossible for the court to conclude that Plaintiff was terminated in retaliation for complaining that Hardin was harassing Sunna Reed.

The court also cannot conclude that Plaintiff has presented a prima facie case of retaliation as to Ferletia Sheppard's behavior, because Plaintiff has not shown that she engaged in a protected activity by complaining about Sheppard. It is undisputed that Plaintiff complained to the military police and to Defendants about Sheppard, but in doing so, Plaintiff was not opposing an unlawful employment practice by Defendants as required by Title VII's anti-retaliation provision. *See Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997) ("[b]y the terms of [Title VII] . . . not every act by an employee in opposition to [gender-based]

discrimination[11] is protected.  The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual"), quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir.1978).

Thus, even if Sheppard's harassment of Plaintiff could be classified as "discrimination," Plaintiff offers no evidence that her opposition to Sheppard's conduct constitutes opposition to an unlawful employment practice by Defendants. Plaintiff has, therefore, failed to demonstrate that she engaged in a Title-VII protected activity by complaining about Sheppard's threats.  On this basis, Plaintiff's retaliation claim must fail.[12]

## C.     Disparate Treatment – Termination

Plaintiff next alleges she was terminated "on the basis of her sex."  (doc. 2, ¶ 35).  This claim appears to allege disparate treatment because of her gender. However, Plaintiff fails to address this claim in her opposition to the motion for

---

[11]  It is questionable whether Sheppard's behavior even constitutes gender-based discrimination, or discrimination of any kind, as required by Title VII.

[12]  As to the causation element of her retaliation claim, Plaintiff may satisfy this factor by demonstrating a "very close" temporal proximity between her protected activity and her termination.  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001).  Given that only one month passed between her complaints about Sheppard and her termination, as well as allegations by Plaintiff and other witnesses that K & K had threatened to terminate any employees who complained about their working environment outside the company, the court finds a question of material fact as to whether Plaintiff's complaint and her termination are causally connected.  However, this finding does not preserve her retaliation claim, as Plaintiff has not shown that she engaged in a protected activity.

summary judgment, and the court finds no evidence to support it in the record. Therefore, Defendants are entitled to summary judgment on this claim.

### D.    Negligence/Wantonness

Plaintiff finally alleges that Defendants negligently and/or wantonly failed to investigate Dennis Hardin's background before hiring him, and thus failed to discover his "proclivity for sexually harassing female employees." (doc. 2, ¶ 40).  Plaintiff also claims that Defendants negligently/wantonly failed to train Hardin against such behavior, failed to adequately supervise him, negligently/wantonly promoted him to assistant manager and, finally, failed to discipline him, thus failing ultimately to protect K & K's female employees from harassment by Hardin.  (*Id.* ¶¶ 40-46).

Plaintiff asserts further that Defendants either knew or should have known that Hardin was "unfit to act as [K & K's] agent and employee," and that Defendants "directed, aided, participated, authorized or ratified" Hardin's conduct.  (*Id.* ¶ 46). Finally, Plaintiff alleges that Hardin's harassing behavior was "calculated to or did benefit" Defendants.  (*Id.*).

The Alabama Supreme Court has defined wantonness as

"'[The] doing of some act or something with reckless indifference to the consequences of said act, or . . . a failure or omission to do something, with reckless indifference to the consequences of such failure or omission, that is, that the party acting or failing to act is conscious of his conduct, and even though without any actual intent to injure is aware

25

from his knowledge of existing circumstances and conditions that his conduct would probably result in injury to another or in damage to his property.'"

*Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665, 679-80 (Ala. 2001), quoting *Weatherly v. Hunter*, 510 So.2d 151, 152 (Ala.1987), and *W.T. Ratliff Co. v. Purvis*, 291 So.2d 289 (1974).

As to negligence, "[sexual] harassment can be ascribed to the employer's negligence when the employer knew or should have known about the harassment and failed to take remedial action." *Dees v. Johnson Controls World Services, Inc.*, 168 F.3d 417, 421 (11th Cir. 1999).

Turning first to her negligent/wanton hiring claim, Plaintiff offers no evidence to support a finding that Hardin "had a history" of harassing female coworkers prior to his employment at the Redstone Arsenal facility. *Portera v. Winn Dixie of Montgomery, Inc.*, 996 F.Supp. 1418, 1438 (M.D.Ala. 1998). Plaintiff admits that she has no knowledge of what information Defendants had about Hardin when he was hired. (Pl. Dep. pg. 100).

As to training and supervision, Alabama courts do not recognize a distinction between these claims. *See Zielke v. AmSouth Bank, N.A.*, 703 So.2d 354, 358 n. 1 (Ala.Civ.App. 1996); *Portera*, 996 F.Supp. at 1438. The court will thus address those claims as one. "In Alabama, to recover against an employer under the theory of

26

negligent supervision, a plaintiff first must show 'by affirmative proof that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence.'" *Portera*, 996 F.Supp. at 1438, quoting *Ledbetter v. United Am. Ins. Co.*, 624 So.2d 1371, 1373 (Ala. 1993). "'Wanton supervision' requires that the employer wantonly disregard its agent's incompetence." *Armstrong*, 817 So.2d at 665.

Plaintiff offers very little substantive argument or authority to support her claim of negligent/wanton training and supervision. She avers that "the manner in which a sexual harassment complaint is handled" can form the basis for negligent and/or wanton supervision. While this may be true, Plaintiff offers no evidence that she or Reed ever complained to Defendants that Hardin was harassing Reed. As stated repeatedly, Plaintiff deliberately avoided complaining because she feared it would cause Hardin to lose his job. The only attempt Reed ever made to report Hardin to Defendants was when Dan Tyree approached her in the dining room, when Reed was unavailable to speak about it and never sought a second opportunity to report Hardin. Plaintiff offers no basis for the court to find that Defendants were negligent or wanton in supervising or training Hardin when she does not explain how Defendants could be expected to know of and remedy conduct that was apparently not brought to their attention.

27

As to negligent/wanton retention and promotion, Plaintiff argues that Defendants had actual knowledge of Hardin's incompetence during his employment with K & K.  She claims that Defendants knew Hardin had been accused of sexual harassment by two other K & K employees, Sin Cha Williams ("Williams") and "Tammy," who Plaintiff believes – without offering any evidence to prove – were terminated for complaining about Hardin.[13]  The only evidence Plaintiff offers that Defendants knew or should have known about Hardin's alleged harassment of either Williams or Tammy is Williams's testimony that the military police spoke with K & K management about her complaint against Hardin (Williams Aff. ¶ 4), and that Hardin had successfully taken a lie detector test as part of the military police's investigation.  (Pl. Dep. pp. 101-02; Reed Dep. pp 235-36).  No evidence is offered as to whether Defendants knew about any claim of sexual harassment by "Tammy."[14]

Given Hardin's nine-year employment with K & K (Anderson Aff ¶¶ 6, 10, 14), Defendant's knowledge of one report of sexual harassment by Hardin does not demonstrate that Defendants knew or should have known of Hardin's "proclivity" toward harassing his female coworkers and subordinates.  *See Armstrong*, 817 So.2d

---

[13]  The only evidence offered to support Plaintiff's theory is speculation and gossip among Defendants' employees.  (Reed Dep. pp. 237-45; Williams Aff. ¶ 5).

[14]  Plaintiff did not mention Tammy in her deposition or her opposition to the motion for summary judgment.

at 683 ("To carry [her] burden [of demonstrating that Defendants knew or reasonably should have known about Hardin's habit of sexually harassing his female coworkers, Plaintiff] may show either that [s]he informed [Defendants] about the specific misdeeds of [Hardin], or that [Hardin's] misdeeds were 'of such a nature, character, and frequency that [Defendants], in the exercise of due care, must have had them brought to [their] notice'"), quoting *Lane v. Central Bank*, 425 So.2d 1098, 1100 (Ala.1983).  Plaintiff offers insufficient evidence to carry her burden on this point.

In sum, Plaintiff has not established that Defendants either knew or should have known of, or acted with reckless indifference to, the fact that Dennis Hardin was in the habit of harassing female employees either before or during his employment with Defendants.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's negligence/wantonness claims.

## V.    CONCLUSION[15]

Considering the facts alleged in the light most favorable to Plaintiff, and having found no genuine issue of material fact as to any of her claims against Defendants, the court finds that Defendants' motion for summary judgment is due to be **GRANTED**.   Accordingly, Defendants' motions to strike portions of Plaintiff's

---

[15]  Because the court grants Defendants' motion for summary judgment on the merits of Plaintiff's claims, it does not address Defendants' argument that Plaintiff's claims against Harvey Benjamin Fordham, III, should be dismissed.

evidentiary submission are due to be **DENIED as MOOT**.

A separate Order will be entered.

**DONE** and **ORDERED** this the thirtieth day of June, 2008.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

30